IN THE UNITED STATES DISCTRICT COURT FOR

THE WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

| | | |
|---|---|---|
| SARIDA FORD, INDIVIDUALLY | ) | |
| AND ON BEHALF OF | ) | |
| JOHN CHEVALIER; | ) | |
| SALEANA CHEVALIER | ) | |
| AND SABRENA HUGGINS, | ) | |
| INDIVIDUALLY | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | Case No: |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORIGINAL COMPLAINT

Plaintiffs SARIDA FORD, INDIVIDUALLY AND ON BEHALF OF JOHN CHEVALIER, and SALEANA CHEVALIER and SABRENA HUGGINS, Individually, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States and would show the following.

## PARTIES

Case 4:22-cv-00405-RK   Document 1   Filed 06/21/22   Page 1 of 20

1.1.     This is a medical malpractice case that arises out of bodily injuries caused by agents and employees of the United States at the Kansas City, Missouri Veterans Affairs Medical Center in Kansas City, Missouri.

1.2.     Plaintiff is a veteran, John Chevalier. Mr. Chevalier resides in Junction City, Kansas.

1.3.     Plaintiffs Sarida Ford, Saleana Chevailer, and Sabreana Huggins are the daughters of Plaintiff John Chevalier and reside in Junction City, KS. Plaintiff Sarida Ford is the legal representative of John Chevalier through Power of Attorney.

**1.1.**     Defendant is United States of America, its officers, agents, employees, and representatives.

## JURISDICTION, SERVICE & VENUE

2.1.     This Federal District Court has jurisdiction because this action is brought under 28 U.S.C. § 2671–80, commonly known as the Federal Tort Claims Act.

2.2.     The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the acting United States Attorney

Teresa A. Moore, United States Attorney for the Western District of Missouri by certified mail, return receipt requested at her office:

> The United States Attorney's Office
> ATTN: Civil Process Clerk
> Charles Evans Whittaker Courthouse
> 400 East 9th Street
> Room 5510
> Kansas City, MO 64106

2.3.    Service is also affected by serving a copy of the Summons and Complaint on Merrick B. Garland, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

2.4.    Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the United States of America is a defendant and the acts and omissions complained of in this lawsuit occurred in this judicial district.

## AGENCY

3.1.    This case is commenced and prosecuted against the United States of America to and in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages of which the complaint is made were proximately caused by the negligence, wrongful

acts and/or omissions of employees and/or agents of the United States of America working for the Veterans Affairs, while acting within the scope of their office, employment, and/or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiff in the same manner and to the same extent as a private individual.

3.2.     The United States Department of Veterans Affairs is an agency of the United States of America.

3.3.     The United States of America, through its agency, Veterans Affairs, at all times material to this lawsuit, owned, operated, and controlled the Kansas City VAMC.

3.4.     At all times material to this lawsuit, including 2015 to 2019, providers at Kansas City VAMC were acting within the course and scope of their employment when providing treatment to Mr. Chevalier.

3.5.     At the time of this incident on or about February 1, 2018, the Kansas City VAMC provided care and treatment to Mr. Chevalier. Mr. Chevalier was a patient of the Kansas City VAMC and its providers had a doctor-patient relationship with Mr. Chevalier.

## JURISDICTIONAL PREREQUISITES

4.1.     Pursuant to 28 U.S.C. §§ 2672 and 2675(a), the claims set forth here were filed with and presented administratively to the Department of Veterans Affairs on August 5, 2019. On June 22, 2021, the VA denied via

certified mail the administrative claim. Plaintiff requested reconsideration of the VA's denial on July 19, 2021. The claim was denied a second time on December 28, 2021.

4.2.     This lawsuit was filed in the Western District of Missouri within six months after the date of mailing of the final denial notice.

4.3.     Accordingly, Plaintiff has complied with all jurisdictional prerequisites and conditions precedent to the commencement and prosecution of this suit.

## FACTS

5.1     This claim concerns the substandard medical care provided to John R.D. Chevalier, then age 63, by the Kansas City VAMC due to failure to properly perform ACDF (anterior cervical discectomy and fusion) with both surgical and post-operative errors that tragically resulted in a permanent anoxic brain injury for Mr. Chevalier.

5.2     Mr. Chevalier underwent an MRI of the cervical spine on May 16, 2016. The decision was made for conservative treatment. The following year, he was seen again for a Neurology Consult, by Dr. James A. Wolter, M.D., Staff Neurosurgeon. He was complaining of weakness of the arms and legs and problems with numbness of the hands. Another cervical MRI was ordered and performed July 28, 2017. Approximately 2 months later, on September 18, 2017, Mr. Chevalier presented for a follow-up appointment with Dr. Wolter. The cervical stenosis had progressed and Dr. Wolter recommended

surgery. Dr. Wolter did not express any urgency for surgery and agreed to waiting until after the holidays for the surgery. Dr. Wolter recommended an anterior cervical discectomy and fusion ("ACDF") at C3-4 and C4-5 with instrumentation and intraoperative neural monitoring. The surgery was scheduled for February 1, 2018.

5.3     On February 1, 2018, Mr. Chevalier presented as scheduled for surgery. Attending Staff was Dr. Wolter and he performed an "ACDF" reporting no complications and minimal blood loss. During the surgery, he positioned an anterior cervical fusion plate spanning C3-C5, placed proud to the cortical bone by up to 6-7 mm at the superior aspect of the plate. The plate used was an absorbable system, the Inion-S1, with screws only at C3 and C5. He failed to secure the cervical plate (the plate was "grossly loose" with no fixation whatsoever in the spine). No documentation of X-rays was done after the hardware was placed, nor was there a read of any imaging of the hardware. Dr. Wolter did not order Mr. Chevalier to be in a cervical collar post-operatively.

5.4     The following day on February 2, 2018 at 09:08, Dr. Wolter documented "minimal throat pain" with a primary complaint of throat "dryness." Mr. Chevalier was deemed "stable" enough to transfer to the floor and a discharge was anticipated for the next day. However, that evening, Mr. Chevalier began complaining of difficulty swallowing and complained that pills were getting stuck in his throat. His voice was also hoarse. These symptoms should have been concerning to a reasonably prudent surgeon due to the anterior approach utilized during surgery.

5.5     On February 3, 2018 at 02:30, Mr. Chevalier complained to nurse Teighlor Barnes, RN that the pills administered at 21:00 still felt like they were stuck in his throat. After attempting to use pudding, bread, apple sauce and thickened liquids to get the pills down, he left his room to go to the ER for help. Nurse Barnes convinced him to stay, called Dr. Wolter, and told Mr. Chevalier that Dr. Wolter would be in to see him in the morning.

5.6     Additionally, Mr. Chevalier's lab work was significantly abnormal, indicative of surgical complications. On February 2, 2018, Mr. Chevalier's Sodium (NA) was low at 133L (normal 136-145); his WBC was elevated at 16.7 H (3.60-11.20); and he was anemic with RBC 3.79L (4.10-5.70), HGB 10.0 (13.1-16.8) and HCT 30.6 L (38.2-48.4). Pre-operatively, Mr. Chevalier's blood work was Sodium 140, WBC 9.73, RBC 4.49, HGB 12.1, and HCT 36. Although one can expect a slight drop in H&H due to surgery, the post-operative surgical report documented minimal blood loss in the surgery. Therefore, a progressive decrease in RBC, HCT (anemia) and Sodium with increase in WBC (leukocytosis) documented on POD 2, along with concerning symptoms of continued difficulty swallowing, choking, and neck swelling following an anterior approach spine surgery were red flag signs of hematoma/abscess formation with high risk for respiratory compromise that were missed by Dr. Wolter and Kansas City VA health care providers.

5.7     The morning of February 3, 2018 at 04:56, POD 2, Mr. Chevalier's blood work was continuing to trend in the wrong direction. The lab results revealed Sodium 124 L (136-145), WBC 27.30 H (3.6-11.20), RBC 3.71 L (4.10-5.70), HGB 10.2 L (13.1-16.8) and HCT 29.7 L (38.2 – 48.4).

5.8      At 9:01 on February 3, 2018, Dr. Wolter was at Mr. Chevalier's bedside and documented his choking issues. His note stated, "Voice minimal hoarseness…I had him drink water in front of me and noted he was able to drink without choking or any other problems…Last night he felt that a pill was stuck in his throat and nursing called me to state that he wanted me to come in and evaluate him or he was going to walk down to the ER…Patient states he wanted me to give him advice before he walked down to the ER." Additionally, Mr. Chevalier's Sodium was dangerously low at 124 (136-145). Despite these issues, Dr. Wolter assessed Mr. Chevalier as "doing well neuro-surgically…I am keeping him in due to his low Na." He then switched Mr. Chevalier to a "clear liquid diet" to see if this helps with his perceived swallowing difficulties…"

5.9      No physical exam or evaluation of Mr. Chevalier's neck or throat was performed by Dr. Wolter and he dismissed Mr. Chevalier's choking concerns, declaring his swallowing difficulties as "perceived." Dr. Wolter failed to acknowledge the other significantly abnormal labs (WBC, RBC & HCT). On POD 2, a surgeon would have expected Mr. Chevalier's complaints of choking and difficulty swallowing to be improved, as well as his RBT, HCT and WBC to be normalizing. Instead, Mr. Chevalier's labs were increasingly abnormal and his symptoms were worsening to the point that he was scared enough to consider walking down to the ER for an evaluation. Dr. Wolter falsely reassured Mr. Chevalier because he was far from okay.

5.10    Approximately 4 hours and 45 minutes after Dr. Wolter saw Mr. Chevalier, at 13:42 on February 3, 2018, Mr. Chevalier suffered a cardiac

arrest. He had been drinking water from a cup when he began to choke. He left his room in search of a nurse for help. The swelling of his neck from the mal-positioned and loose cervical plate compromised his esophagus and trachea. His progressively compressed airway led to difficulty swallowing even water. Mr. Chevalier began choking with an inability to maintain his airway, followed by respiratory failure and cardiac arrest with subsequent development of seizures and a devastating anoxic brain injury.

5.11    Following Mr. Chevalier's cardiac arrest, Dr. Wolter documented "Events occurred slight prior to 2pm – I arrived around 2:20. Patient was already in the MICU. Apparently he came out of room looking at nurse unable to verbalize but nodded head to chocking and in trying to get back to bed lost consciousness and was eased to floor. Turned blue and was pulseless – code called – intubated by Dr. Lorel apparently noting secretions but no obstruction – in my conversation with Dr. Lorel he said that there was no evidence of hematoma and the intubation was very easy." Dr. Wolter finally documented the increase in WBC as well as decreased Sodium: "WBC markedly increased with lactic acid and Na 119 worse than earlier today…" A CT of the brain, cervical spine and soft tissue of the neck were finally performed.

5.12    The impression of the CT scan of the brain that was performed at 15:07 on February 3, 2018 due to "Code Blue" stated, "Subtle new low-attenuation in the right temporal lobe with 5 mm faint nonspecific hyperintensity in the right temporo-occipital region was not seen on previous imaging studies, and short interval follow-up CT or MIR may be considered for further evaluation."

5.13    The CT of the Neck Soft Tissue and CT of the Cervical Spine report stated, "Clinical History; Patient with recent laminectomy. Code blue." Findings included "The patient has undergone recent anterior cervical fusion of C3 and C5, the anterior cervical plate is proud to cortical bone most notably at the superior aspect of the plate, where it measures up to 6 to 7 mm…There is soft tissue gas with fat stranding in the subcutaneous and deep soft tissues at the level of the hyoid on the right side, correlate with recent intervention to this area." Impression stated, "The anterior cervical fusion plate spanning C3-C5 appears proud to cortical bone by up to 6-7 mm at the superior aspect of the plate…The prevertebral soft tissues appear full however this is in the range of expected given the recent surgery and intubation…The degree of remaining spinal cord stenosis and foraminal narrowing could be better assessed on MRI when clinically feasible."

5.14    Despite the image showing a mal-positioned plate and MRI recommended to assess spinal cord stenosis, Dr. Wolter determined that no neurosurgical intervention was required. Mr. Chevalier's spinal cord was being compromised due to the mal-positioned plate that went undiagnosed due to failure to obtain an MRI.

5.15    Sarida Ford, Mr. Chevalier's daughter was shocked and upset when she received a call from Dr. Wolter telling her that her father had suffered a cardiopulmonary arrest. Dr. Wolter informed her that her father had left his bedroom while choking, looking for help, turned blue, passed out and stopped breathing. Sarida told Dr. Wolter that her father consistently complained that his throat was hurting, then it progressed to complaints of

hoarseness, swallowing and choking problems since he was in the ICU. But all of his complaints were dismissed and he was told he was fine. In fact, he had been told that morning that he would be discharged that day. Sarida asked Dr. Wolter what caused this to happen and he said he wasn't sure, that they had not been able to determine the cause yet. She asked whether swelling from the surgery could have caused it, and Dr. Wolter assured her that his swelling from surgery was normal. However, Dr. Wolter then asked Sarida for consent (as she had Power of Attorney for her father) to go back inside the surgical site to be sure there was not an issue since the etiology of her father's cardiac arrest was unclear based on the tests performed. She gave consent to go back into the surgical site and asked him to conduct any necessary tests to help her father. She later received a call back from Dr. Wolter that her father had begun having seizures. Therefore, he had decided not to go back into the surgical site due to his condition and evidence of fluid in his lungs due to aspiration.

5.16    Once Mr. Chevalier was in the MICU, Dr. Hamza Coban, Resident Physician and Dr. Mark W. Plautz, Pulmonary/Critical Care Staff Physician documented that "Today at approx.. 13:45, Nursing reports that patient came out of his room holding his cup of water and making choking sounds. HT and myself went to patient to assist back to room, asked patient if he was choking, he nodded his head yes, patient then tried to walk back into his room, legs began shaking and he went down to his knees, patient was not responding to stimuli and was turning blue, could not find pulse, code blue called and compressions started. Patient achieved ROSC (return of

systemic circulation) after coded approximately 5 minutes. Patient was intubated for airway protection and transferred to MICU."

5.17  The following day, on February 4, 2018, Mr. Chevalier's right sided neck swelling was even worse. Another CT of the neck was ordered due to "worsening swelling of the right neck concern for bleed." The CT scan documented "stranding in the neck soft tissues that could represent edema and/or inflammation. Infection cannot be excluded." Dr. Wolter documented the presence of a liquefied hematoma from the middle portion of the incision but did not obtain a culture from the neck incision. He failed to recognize that the mal-positioned and loose hardware was causing spinal cord compression. Dr. Wolter noted Mr. Chevalier was having seizures and put him on Keppra.

5.18  On post-operative Day 4, Mr. Chevalier was weaned off of sedation but then began having seizures again. He was sedated and given more Keppra. He spiked a fever to 100.4 and in his assessment/plan, it was noted "Concern for ischemic brain injury, concern for status epilepticus." Later that morning, he was seen by Yana Nesterenko, Resident Physician and Dr. Time E. Frederick, Neurologist for management of his ongoing seizure activity.

5.19  The following morning, February 5, 2018, it was noted that he developed another seizure overnight and had a fever of 101.7. His labs continued to worsen despite being on antibiotics.

5.20  At 12:37 on February 5, 2018, the recommendation was made to transfer Mr. Chevalier for higher level care. He was transferred to the University of Kansas hospital that afternoon, which most likely saved his life. Mr. Chevalier had walked into the Kansas City VA neurologically intact and

living independently; he left intubated, sedated, suffering seizures, and unresponsive. He was diagnosed with Hypoxic Ischemic Encephalopathy (HIE) due to an anoxic brain injury. He was stabilized and underwent surgery on February 16, 2018 to remove the cervical hardware plate due to spinal compression from the mal-positioned hardware and a washout of the hematoma was performed. The operative report stated, "Pre-operative Diagnosis: Loose anterior cervical plate with loss of fixation and rule out infection, status post anterior cervical discectomy with allograft and plate performed by another surgeon."

5.21    Under "Indications for Procedure," it stated, " An MRI scan was obtained and ultimately a CT that shows loss of fixation with loose anterior cervical plate, compromising his airway and the esophagus. In addition, there has been some question as to whether the fluid collection at the surgical site may be infectious in nature."  Under "Descriptions and Findings of Operative Procedure," it stated, "Blunt plate was grossly loose and actually had no fixation whatsoever in the spine. The plate was removed and sent for sonication."

5.22    Mr. Chevalier remained critically ill and gradually began to wake up. He suffers from a permanent brain injury and resides in a private skilled nursing facility. He can now blink his eyes in response to questions but remains a quadriplegic with minimal voluntary movement and requires 24/7 skilled care.

5.23    United States government health care providers were negligent in failing to properly and safely perform ACDF on Mr. Chevalier. Improper positioning of the hardware, improper use of hardware not suitable for the

quantity/quality of bone in Mr. Chevalier's cervical spine, and failure to secure the cervical plate caused loosening of the hardware and plate and spinal cord compromise. In addition, the surgical team failed to obtain and ensure hemostasis at the anterior incision site intraoperatively, allowing development of a hematoma. The negligence continued post-operatively when providers failed to examine the stability of the hardware by X-ray, or stabilize Mr. Chevalier's neck with a cervical collar. Additional post-operative negligence included the failure to timely and appropriately intervene when Mr. Chevalier developed abnormal and progressive symptoms following surgery including but not limited to abnormal H&H, leukocytosis, increased right-sided neck swelling, choking episodes, difficulty swallowing – concerns that Mr. Chevalier alerted them to himself.

5.24    Instead, he was falsely reassured by Dr. Wolter that he was fine just hours before he suffered respiratory failure and cardiac arrest due to choking from esophageal and tracheal compromise. No imaging was performed to assess the hardware placement or possible hematoma until after Mr. Chevalier suffered this catastrophic event. Despite abnormal imaging, Mr. Chevalier continued suffering seizures for 2 days before he was transferred to higher level care.

5.25    Due to the Government's negligence, Mr. Chevalier suffered cardiac arrest, respiratory failure with hypoxia and hypercapnia, acute hyponatremia, acute blood loss anemia all due to the loss of fixation with a loose anterior cervical plate that compromised his airway and esophagus, which resulted in his permanent brain injury. Mr. Chevalier's life has been drastically

and permanently destroyed due to the negligence of the Kansas City VAMC providers. He is a quadriplegic and dependent on others 24/7 and will be for the rest of his life.

## CAUSES OF ACTION

6.1.    Through its employees, agents, or servants, the Defendant United States of America, was negligent in one or more of the following respects:

(a) Negligently performing ACDF surgery on Mr. Chevalier;

(b) Negligently failing to timely and properly diagnose Mr. Chevalier;

(c) Negligently failing to timely and properly provide imaging for Mr. Chevalier;

(d) Negligently using a cervical plate that was contraindicated for use given the quality of Mr. Chevalier's cervical bone;

(e) Negligently failing to timely and properly follow-up and intervene post-operatively despite worsening clinical signs, symptoms, lab values and tests requiring such intervention.

(f) Negligently failing to timely diagnose and treat Mr. Chevalier's post-operative hematoma;

(g) Negligently failing to timely and properly treat Mr. Chevalier;

Case 4:22-cv-00405-RK   Document 1   Filed 06/21/22   Page 15 of 20

(h) Negligently failing to timely and properly care for Mr. Chevalier; and

(i) Negligently placing Mr. Chevalier on a clear liquid diet, which was contraindicated given his signs/symptoms;

(j) Negligently failing to timely and properly diagnose and respond to Mr. Chevalier's worsening lab values; and

(k) Negligently failing to timely and properly evaluate Mr. Chevalier.

(l) Negligently failing to timely and properly intervene and treat Mr. Chevalier by initiating the chain of command to treat Mr. Chevalier's deteriorating condition when Dr. Wolter failed to properly assess and treat Mr. Chevalier's deteriorating condition.

6.2.    At all times relevant to this lawsuit, the officers, employees, agents, or representatives of the United States were negligent and caused the injuries and damages sustained by the Plaintiff.

## DAMAGES

7.1.    Because of Defendant's negligence, Plaintiff has suffered, and continue to suffer, severe injuries, including past and future physical and mental pain and suffering; past and future medical, healthcare, and attendant care expenses; past and future physical disfigurement; past and

future permanent physical impairment; loss of enjoyment of life; loss of earnings and earning capacity; and out of pocket expenses and other pecuniary losses. Such injuries are, in reasonable probability, permanent. Plaintiff brings this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries to them.

7.2.    Because of the negligence of the United States employee healthcare providers, Mr. Chevalier sustained damages and injuries including:

(a) Reasonable and necessary past and future medical expenses;

(b) Reasonable and necessary attendant, home health, and nursing care expenses;

(c) Past and future physical impairment;

(d) Past and future physical disfigurement;

(e) Past and future mental impairment;

(f) Past and future physical pain and suffering;

(g) Past and future mental anguish; and

(h) Other pecuniary damages.

In addition, Mr. Chevalier seeks recovery of all other damages to which he is entitled to under the applicable federal and state laws.

7.3     Because of the negligence of the United States employee healthcare providers, Plaintiffs Sarida Ford, Saleana Chevailer, and Sabreana Huggins, as daughters of John Chevalier suffered injuries which would not have otherwise occurred. They pleased for all damages available under state and federal law including, but not limited to:

  (a) Past and future attendant care;

  (b) Past and future mental anguish;

  (c) Past and future loss of consortium with their father John Chevalier;

  (d) Past and future out-of-pocket expenses; and

  (e) Other pecuniary damages.

## RELIEF REQUESTED

8.1.     Plaintiffs request that the United States be cited in terms of law to appear and answer this lawsuit. Upon final trial, Plaintiffs seek judgment against the United States for the amount of actual damages and for such other and different amounts that he shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in the prosecution of this lawsuit; and for such other relief, in law or equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court believes them deserving.

Respectfully Submitted,


/s/ Jamal K. Alsaffar
**JAMAL K. ALSAFFAR,** *pro hac vice*
    jalsaffar@nationaltriallaw.com
    Texas State Bar #24027193
**LAURIE HIGGINBOTHAM**, *pro hac vice*
    lhigginbotham@nationaltriallaw.com
    Texas State Bar #50511759
**STEVEN HASPEL**, *pro hac vice*
    shaspel@nationaltriallaw.com
    Texas State Bar #24109981
**WHITEHURST, HARKNESS, BREES, CHENG, ALSAFFAR, HIGGINBOTHAM, & JACOB P.L.L.C.**

1114 Lost Creek Blvd. Suite 410
Austin, TX 78746
(512) 476-4346 (o)
(512) 467-4400 (f)


/s/ Michael Campbell
MICHAEL E. CAMPBELL, Bar No. 63745
2600 Forum Blvd., Ste. B1
Columbia, MO 65203
Telephone No. 573-607-1818
Fax No. 573-606-8670
Mike.campbell@thomaslawoffices.com
    LOCAL COUNSEL

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE & COMPLIANCE

By my signature below, I certify that a copy of this pleading, Plaintiffs' Motion, has been sent to the following on June 21, 2022 via the Court's CM/ECF notice system.

**TERESA A. MOORE**
ACTING U.S. ATTORNEY


/s/ Laurie Higginbotham
Laurie Higginbotham
WHITEHURST, HARKNESS,
BREES, CHENG, ALSAFFAR,
HIGGINBOTHAM, & JACOB P.L.L.C.